**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **CARIS LIFE SCIENCES, LTD.,** | § | |
| | § | |
| *Plaintiff* | § | |
| | § | |
| **vs.** | § | **Civil Action No.** |
| | § | |
| **NATERA INC., DAVID "DAVE"** | § | |
| **BASHER, JUSTIN TROY ALTER,** | § | |
| **ELISABETH "LIZ" CRAMER,** | § | |
| **JONATHAN DERR, TARA HASHER,** | § | |
| **DERRICK LEDFORD, ERIC "RICK"** | § | |
| **SAUSE AND KEVIN SHIPP** | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

---

## ORIGINAL VERIFIED COMPLAINT

---

Plaintiff Caris Life Sciences Ltd. ("Caris") files this Original Verified Complaint against Natera Inc. ("Natera"), as well as Justin Troy Alter ("Alter"), Elisabeth "Liz" Cramer (Cramer), Jonathan Derr ("Derr"), Tara Hasher ("Hasher"), Derrick Ledford ("Ledford"), Eric "Rick" Sause ("Suase") and Kevin Shipp ("Shipp") (collectively "Defecting Defendants"), and David "Dave" Basher ("Basher"), and would show the Court as follows:

### INTRODUCTION

1. Caris is a biotechnology company committed to fulfill the promise of precision medicine through diagnostic, genome profiling, and other testing technologies that help patients with cancer and other complex diseases. There are a relatively small number of firms in the molecular profiling market, particularly in the oncology space, and competition is fierce. Knowledge of cutting edge technologies and how to sell them is highly sought after. Caris has gained a competitive advantage

through the quality of the products and services it sells and its extraordinary investment in training its employees and having its sales force build close customer relationships along with in-depth knowledge regarding its technologies and their competitive benefits over others.

2.       On April 20th, seven members of Caris oncology sales team spread over six (6) different states resigned on exactly the same day in a carefully orchestrated fashion to go to a new competitor (Natera).  Apparently, Natera decided to move into the oncology space (a major focus of Caris' business), but not through ordinary diligence and hard work like building its own sales force and customer relationships but instead by stealing them from Caris.  It apparently made no difference whatsoever to Natera that the members of Caris' oncology sales team it hired were all subject to noncompete and customer nonsolicit restrictions that would prohibit them from engaging in the competitive activity Natera has hired them to perform.

3.       Natera's focus on raiding Caris was no coincidence.  It almost certainly was the result of having previously hired Defendant Basher, a former Vice President at Caris and former leader in the Caris oncology sales group.  At the time he left Caris in early 2019 Basher indicated no intent to compete with Caris.   However, it is clear that once Basher got to Natera and shared his insights about Caris' oncology business and its sales teams (all based on confidential information entrusted to him when he was a member of Caris' management), Natera saw an opportunity to cheat its way into a profitable new line of business.

4.       Natera formed a partnership with a key competitor of Caris to get competitive technological options in oncology and then conspired with Basher to orchestrate a carefully choreographed raid on Caris' oncology sales force.   To add insult to injury, the defecting individual defendants who resigned to go to Natera have downloaded customer lists and other significant volumes of Caris confidential information in the final weeks before their departure to assist them in their competitive

efforts.  And, one individual even went so far as to tell a member of Caris sales force who was trying to cover his appointments that he was not going to provide the information needed to do so because he intended to keep the appointments he had made with Caris customer's while on Caris payroll and convert them to his use at Natera.

5.      Caris has no complaint with aggressive competitors who play fair and earn their place in the market through hard work.  However, the conduct of Natera, Basher, and the conspiring band of defectors they recruited could not be any further from this standard.  This lawsuit is filed to enforce the restrictive covenants that the defecting individual defendants agreed to, and to hold Natera and Basher accountable for their illegal acts.

6.      The defecting individual defendants all tendered two-week notice resignations indicating they would not be starting work for Natera until on or after May 5th.  Caris fully intends to pursue injunctive relief to enforce the restrictive covenants that the defecting defendants agreed to, including limitations that would not permit the individual defendants to engage in the kind of customer solicitation and raiding they are apparently planning to undertake, but current circumstances (such as shelter-in-place orders) are limiting and slowing down some evidence collection efforts.  Nevertheless, Caris will file an Application for Injunctive Relief with supporting evidence and Motion for Expedited Discovery related to it within 10 business days.

## PARTIES

7.      Caris Life Sciences Ltd., is a Cayman Islands exempted company with its principal place of business in Irving, Dallas County, Texas.

8.      Defendant Natera Inc. is a Delaware corporation with its principal place of business in San Carlos, California.   Natera may be served through its registered agent for service in the State of Texas: National Registered Agents, Inc., 1999 Bryan Street, Suite 900, Dallas, Texas.

9.      Defendant Basher is a Florida resident and may be served at 825 18th Avenue NE, St. Petersburg, Florida 33703.

10.     Defendant Alter is an Arizona resident and may be served at 7976 E. Parkview Lane, Scottsdale, Arizona 85255.

11.     Defendant Cramer is a Maryland resident and may be served at 18112 Headwaters Drive, Olney, Maryland 20832.

12.     Defendant Derr is an Indiana resident and may be served at 10135 Greenoak Boulevard, Fort Wayne, Indiana 46804.

13.     Defendant Hasher is North Carolina resident and may be served at 1013 Hawk Hollow Lane, Wake Forest, North Carolina 27587.

14.     Defendant Ledford is a North Carolina resident and may be served at 637 Pinnacle Drive, Iron Station, North Carolina 28080.

15.     Defendant Sause is a Maryland resident and may be served at 1013 Brice Road, Rockville, Maryland 20852.

16.     Defendant Shipp is a Louisiana resident and may be served at 3016 Valcour Aime Avenue, Baton Rouge, Louisiana 70820.

## JURISDICTION AND VENUE

17.     Pursuant to 28 U.S.C. § 1332(a), this Court has subject-matter jurisdiction over this civil action because complete diversity of citizenship exists and the amount in controversy exceeds the sum or value of $75,000.00, exclusive of interests and costs.

18.     Venue and jurisdiction properly lie in the Northern District of Texas, Dallas Division because the contracts at issue in this action contain venue and jurisdiction consent provisions

consenting to state and federal courts located in Dallas County, Texas.  In addition, all or part of the events giving rise to the legal claims asserted by Caris occurred in Dallas County, Texas.

19.     The value of an action related to the validity of restrictive covenants "is determined by appraising the work of [the Employee's] employment during the time period the covenant against competition purports to cover."  *Ray Mart, Inc. v. Stock Bldg. Supply of Texas, L.P.*, 435 F. Supp. 2d 578, 587 (E.D. Tex. 2006); *Component Mgmt. Serv., Inc. v. America II Elec., Inc.*, No. 3:03-CV-1210-P, 2003 U.S. Dist. LEXIS 24096, at *8 (N.D. Tex. Sept. 9, 2003) ("Even assuming that the only provision at issue in this case is the no-compete clause (and not the on-going confidentiality clause), the amount in controversy would be equal to at least the value of Smith's employment while the no-compete clause was still in effect . . . .").

20.     Defendant Basher and the Defecting Defendants were all paid a base salary well in excess of $75,000.00 / year.   In addition to their base salary, Defendant Basher and Defecting Defendants also received commissions and shares of Caris' stock—the total value of which also, independently was well in excess of $75,000.00.  In addition, the profit from the lowest sales volume out of any of the individual Defendants in their final twelve to twenty-four months with Caris, easily exceeded $75,000.  Consequently, using any number of alternative approaches, the amount in controversy threshold is clearly met.

21.     This Court has personal jurisdiction over the Defendants for a number of different reasons. First, all of the Defendants except Natera contractually consented to jurisdiction over them by the courts located in Dallas County, Texas.   *See Atlantic Marine Constr. Co. v. U.S. Dist. Court for W.D. Tex*, 134 S. Ct. 568, 582 (2013) ("When parties agree to a forum-selection clause, they waive the right to challenge the preselected forum as inconvenient or less convenient for themselves or their witnesses or for their pursuit of the litigation."); *Nat'l Equip. Rental, Ltd. v. Szukhent*, 375

U.S. 311, 315, 84 S.Ct. 411, 11 L.Ed.2d 354 (1964) ("[P]arties to a contract may agree in advance to the jurisdiction of a given court, to permit notice to be served by the opposing party, or even to waive notice altogether.").

22.     Second, the Defendants (including Defendant Natera) have regular and systematic contacts with the state of Texas and have purposefully availed themselves of the benefits of doing business in the state of Texas.  The individual Defendants knowingly contracted with a Texas company as their employer.  To learn the ins and outs of Caris' precision medicine business, the Defecting Defendants repeatedly traveled to Irving, Texas to attend national and/or regional sales meetings where they would receive confidential and sensitive information concerning their Texas-based employer's products, services, and training and growth opportunities. Moreover, Defendant Basher and Defecting Defendants would regularly communicate with and receive information from Caris' Salesforce and Sales Analytics group—both of which are located in Texas. This lawsuit, in part, concerns their unlawful use and disclosure of the very information they obtained during these sales meetings and from Caris' Salesforce and Sales Analytics group.   Further, Defecting Defendants Derr, Sause and Shipp even took advantage of the Texas market and represented in electronic communications to the public and Caris' prospective and existing customers that they were operating from Caris' headquarters, located in Texas.

23.     Natera is registered to do business in the State of Texas with the Secretary of State.  Natera actively does business in Texas with a laboratory and offices in Austin, Texas.  Defendant Natera also has a Senior Vice President of Operations and People who, on information and belief, directly or indirectly manages Natera's hiring decisions and other human resource management from its Texas offices.

24.     Third, as the foregoing would suggest, all or part of claims against the Defendants arise from conduct occurring in or directed by one or more of the Defendants from the State of Texas. As explained elsewhere in this Complaint, Defendant Natera engaged in tortious conduct with the intention that the tortious conduct would have seriously harmful, long-lasting effects in Texas. Defendant Natera's tortious interference, although at least partially done outside of Texas, was done with the primary intent of damaging Caris, a competitor, who is a Texas-based employer. *Calder v. Jones*, 465 U.S. 783, 789-90 (1984); *Central Freight Lines, Inc. v. APA Transp. Corp.*, 322 F.3d 376 (5th Cir. 2003).  Upon information and belief, Defendant Natera's Senior Vice President of Operations and People who would be the one responsible for recruiting and hiring of the Defecting Defendants in violation of their contracts with Caris is located in, and directs decisions of this nature from Natera's office in Austin, Texas.

25.     Further still, the actions complained of in this lawsuit arise out of Defendant Basher's and Defecting Defendants' employment with a Texas-based employer who paid them wages and compensation drawn from an account managed at the Texas branch of its bank.  The Defecting Defendants' sales activities regularly involved communications and paper work exchanged with Caris' Texas-based offices.  While performing their duties for the Texas-based employment, Defendant Basher and Defecting Defendants routinely accessed information from databases, servers and other electronic storage media—all of which were located in Texas. In fact, Defendant Ledford, Cramer, and Souse downloaded client data stored on those servers and/or databases, in violation of the stock option agreement at issue in this litigation, before defecting to Natera. Likewise, Defendant Cramer used those Texas-based servers to transmit to her personal email address several confidential Caris presentations and documents, in violation of the stock option agreement at issue in this litigation. This lawsuit is based, in part, out of this unlawful disclosure

and use of such information.  *See Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208 (5th Cir. 1999);

*Union Carbide Corp. v. UGI Corp.*, 731 F.2d 1186 (5th Cir. 1985); *see also Stelax Industries, Ltd.*

*V. Donahue*, 2004 WL 733844, *4 (N.D. Tex. Mar. 25, 2004).

## FACTS

### CARIS' ONCOLOGY FOCUSED MOLECULAR PROFILING BUSINESS

26.     Caris, an innovative biotechnology company, is committed to fulfill the promise of
precision medicine through its unique and transformative platforms to help patients with cancer
and other complex diseases. To fulfill that promise, it developed Caris Molecular Intelligence.
With this molecular profiling tool, Caris identifies biomarkers in a tumor sample and aids
oncologists in using an individual patient's biomarker profile to select personalized treatment
options they may not have previously considered.

27.     Given the relatively small number of firms in the molecular profiling market, competition
is fierce. Caris has gained a competitive advantage through the quality of the products it sells, the
value-added, life-saving services it offers, its customer relationships and knowledge, its customer
goodwill, the training it provides to its employees and its strategic monitoring and planning of
operations.

28.     In the course of developing and conducting its molecular profiling business, Caris has
invested substantial time, expense, and resources to build its reputation, image, and relationships
with customers, suppliers, vendors, and other business contacts. Further, the innovative biotech
company has established a valuable and substantial business reputation and positive trade and
patronage.

29.     A significant part of Caris' business focuses on molecular profiling for use in the field of
oncology.   The oncology-related molecular profiling part of Caris' business is led by a team of

individuals who focus specifically on oncology customers.   It is this oncology sales group that is at issue in this case.

### INDIVIDUAL DEFENDANTS' CONTRACTUAL OBLIGATIONS

30.     The Defecting Defendants were all part of Caris' oncology sales group.   When they were hired, they all agreed as a condition of their employment to noncompete, customer nonsolicit, and employee nonsolicit restrictions. In these restrictions they agreed not to engage in competition with Caris for one (1) year after their employment ended and not to solicit Caris' customers and/or employees for the benefit of a competitor or to cause them to leave Caris or forego doing business with it during that one year period.   In addition, they agreed not to engage in the unauthorized use or disclosure of confidential information as defined in the letter agreement for as long as the information remained confidential.  An example of one of these Letter Agreements is attached as Exhibit A.

31.     As a result, it was made clear to all of the individual Defendants from the outset that as a condition of their employment relationship with Caris they would need to comply with a number of important restrictions should they chose to leave employment at Caris.  In addition to the Letter Agreements, each of the Defecting Defendants was given the opportunity to participate in Caris' long term incentive plan (the Caris Life Sciences, Ltd, 2012 Incentive Plan) (the "Plan").  Under the Plan the Defecting Defendants were given the opportunity to participate in the equity of the business through stock options.  As a condition of this participation, each individual had to agree to the terms of a Share Option Award Agreement ("Options Agreement").

32.     The purpose of the Options Agreement and the award of stock options was to align the individual Defendants' interests with those of Caris, and to provide incentive for the individuals to contribute to and participate in the growth of the goodwill of the business.  In addition, the

Options Agreement was designed to protect the Confidential Information and other property and interests of Caris, create an incentive for continued employment and workforce stability, and ensure that the individuals remained loyal to Caris and did not engage in conduct that was detrimental to the business and their fellow equity participants during employment and for a period of time thereafter.

33.     The Options Agreements entered into by each of the Defecting Defendants over time have some variations in them, but the most recent generation of Options Agreements contain a number of key provisions concerning restrictions that are at issue in this case.  Copies of the individual Defendants' Options Agreements are attached hereto as Exhibits B - H.

34.     The Options Agreements all contain protective covenants designed to protect Caris' intellectual property and legitimate business interests and prevent unfair competition through the use of Confidential Information, training, and goodwill (with customers and employees) developed and acquired by participating employees in the course of their employment relationship with Caris. By way of example, with respect to confidentiality and non-disclosure, the Options Agreement provides as follows:

> As consideration for entering into this Agreement and in addition to the receipt of this Option, the Company agrees to provide Participant with Confidential Information and Trade Secrets as defined in Schedule A to assist with the performance of his or her duties for the Company. Participant agrees not to use or disclose any such Confidential Information, Work Product or Trade Secrets, either directly or indirectly, for the benefit of anyone or any entity other than the Company, as more fully defined in Schedule A.

Ex. B, § 10.

> Participant hereby agrees to the following covenants and provisions in connection with his/her employment by Company and participation in the Plan:
>
> *(a) Duty of Confidentiality*. To assist Participant in the performance of his or her duties for the Company, the Company has provided and

will provide to Participant certain Confidential Information and Trade Secrets. Participant agrees that during the period of Participant's employment with the Company and at all times thereafter, Participant shall not, on Participant's own behalf or on behalf of any third party, directly or indirectly divulge or make use of any Confidential Information or Trade Secrets without prior written consent of the Company, which consent may be withheld in the Company's absolute discretion; provided, however, that Participant may make disclosures required by a valid order or subpoena issued by a court or administrative agency of competent jurisdiction, in which event Participant will promptly notify the Company of such order or subpoena, in a reasonable time prior to such disclosure so that the Company has the opportunity to protect its interests. Participant further agrees that if Participant is questioned about information subject to this Agreement by anyone not authorized to receive such information, Participant will promptly notify Participant's supervisor(s) or an officer of the Company.

*(b) Non-Disclosure*. Participant agrees to hold in confidence all Confidential Information, Work Product, Trade Secrets and company records received from the Company or at the Company's expense and shall not at any time directly or indirectly disclose, publish or use any Confidential Information, Work Product, and/or company records for the benefit of anyone other than Company. This restriction shall apply to all information received prior to or after the effective date of this Agreement and continue in effect after the Participant's employment ends in perpetuity, or until such information becomes a part of the public domain through means other than wrongful disclosure.

(c) "*Confidential Information*" means information about the Company and its employees, customers, processes, technology, and other information that is not generally known outside of the Company, which Participant learns in connection with Participant's employment with the Company and which would be useful to competitors of the Company. Confidential Information includes, but is not limited to: (1) business and employment policies, marketing methods and strategies and the targets of those methods and strategies, financial data, business plans, promotional materials, pricing and pricing strategies, profit and loss statements, and sales and account records; (2) present and prospective customer lists, customer preferences and buying patterns, distribution records and customer credit information; (3) the Company's inventions, innovations, improvements, discoveries, methods, research data and results, databases, research techniques and methodology, analytical approaches, software, and programs; and (4) the nature, origin,

composition and development of the Company's brands, products and services. "***Trade Secrets***" means Confidential Information which meets the additional requirements of the Uniform Trade Secrets Act or similar state law. The term "***Work Product***" means developments, discoveries, source code, object code, software, methods, processes, designs, inventions, ideas, or improvements conceived, made, implemented, or reduced to practice by Participant, whether acting alone or with others, during Participant's employment with the Company.

Ex. A, Schedule A § III. This restriction is hereafter referred to as the Defendants' "**Confidential Information Obligations**."

35.     With respect to non-competition and non-solicitation of customers, vendors, and suppliers, the Options Agreement contains the following restriction:

So long as Participant is employed by the Company and for a period of one (1) year after the termination of employment for any reason, Participant shall not, directly or indirectly, either acting alone, or as a stockholder, partner, associate, creditor, consultant, adviser, franchiser, franchisee, director, officer, owner, employee or agent of any other person or entity, or in any other capacity, engage in, be employed by or provide services to any third party engaged in, or otherwise enable, aide, or facilitate any third party in its engagement in, a "***Restricted Activity.***" Restricted Activity shall mean (i) soliciting, contacting, or communicating with any person or entity that was a client, customer, or prospect of the Company while Participant was employed by the Company, and about whom Participant has Confidential Information or with whom Participant has had contact, in person, telephonically, electronically or otherwise, during the eighteen (18) month period preceding the termination of Participant's employment, for the purpose of competing for or diverting any business of the Company, except for contact or communication that is for purely social reasons, in which case Participant shall refrain from discussing business-related matters, (ii) engaging in a business in competition with the Company within the geographic areas defined below, or in any new business activity in which the Company is engaged during the Participant's employment or (iii) soliciting, contacting or communicating with any vendor or supplier of the Company with the intent to interfere with any current or prospective relationship or contract with whom Participant became aware while employed by the Company; (iv) any conduct or action in furtherance of any discovery, research, development, provision, performance, marketing, sale or any other commercialization of any product, service or application that: (a) is directly or indirectly based on, connected with, or relating to lipid encapsulated bodies including intracellular or extracellular microvesicles or exosomes, irrespective of

their form, size or origin, for any utility or purpose; (b) directly or indirectly involves or is based on the use, interrogation, analysis, assessment or preparation of a human sample comprised of blood, urine, saliva or other bodily fluids or any component of any of the foregoing for use in any clinical assessment relating to cancer; (c) directly or indirectly involves molecular profiling of any human-derived sample or specimen and associated therapeutic decision support for any clinical or research purpose relating to or connected with cancer; or (d) directly or indirectly utilizes one or more libraries comprised of oligonucleotides or oligonucleotide derivatives to assess one or more molecular components of a biological, chemical or other system; provided, however, that the restriction contained in this Schedule shall not prohibit Participant from owning not more than 1% of the outstanding stock of any class of any publicly traded corporation, so long as Participant does not actively participate in the business of such corporation.

Due to the highly-competitive nature of the Company's business and relatively few competitors, Participant is prohibited from engaging in the Restricted Activities in the following geographic areas: (i) any country where the Company's products or services are provided; (ii) the North American continent; or (iii) the United States.

Although the parties have, in good faith, used their best efforts to make the provisions of this Schedule A reasonable in both geographic area and duration, and the Parties do not anticipate or intend that a court or arbitrator would find it necessary to reform any such provisions to make them reasonable in geographic area, duration or otherwise. The Parties understand and agree that if a court or arbitrator determines it necessary to reform the scope of this Schedule A in order to make it reasonable in geographic area, duration or otherwise, with respect to you, such court or arbitrator determination shall be effective, binding and enforceable against you.

You acknowledge and agree that the Company's damages in event of any breach or threatened breach of your covenants set forth in this Schedule A will be difficult to determine and that without limiting any other right or remedy of the Company, the Company shall be entitled to appropriate injunctive or equitable relief from a court of competent jurisdiction to prevent any breach or threatened breach without the posting of any bond or other security, which rights shall be cumulative and in addition to any other rights or remedies, in law or equity, to which the Company may be entitled.

Ex. B, Schedule A § I.   The restrictions created by the provisions above are hereafter referred to

as the Defendants' "**Customer Nonsolicit and Noncompete Restrictions**."

36.     With respect to an agreement not to solicit, recruit or hire away Caris employees, the

Options Agreement provides as follows:

> Participant agrees that during the Employment and for a period of one (1) year after termination of the Employment for any reason, Participant shall not, on Participant's own behalf or on behalf of any other person or entity, hire, solicit, seek to hire, or offer employment to any person who was employed by the Company on or during the six months preceding the date of termination of the Employment. Participant further agrees that Participant will not, in any other manner attempt, directly or indirectly, to influence, induce, or encourage any person who was employed by the Company on or during the six months preceding the date of termination of the Employment who is a current or prospective employee of the Company to leave the employment of the Company.

Ex. B, Schedule A § II.  The foregoing restriction is referred to hereafter as the Defendants'

"**Employee Nonsolicit and No-hire Restriction**".

37.     Lastly, the Options Agreement contains a choice-of-law and forum selection provision

that states:

> This Agreement, including, but not limited to, its enforceability, interpretation and legal effect, shall be governed by and construed in accordance with the laws of the State of Delaware without giving effect to its conflict of law principles. If any provision of this Agreement is determined by a court of law to be illegal or unenforceable, then such provision will be enforced to the maximum extent possible and the other provisions will remain fully effective and enforceable. The courts of the State of Texas, for Dallas County or any Federal Court having jurisdiction in that county shall have exclusive jurisdiction with respect to any dispute or litigation arising under this Agreement.

Ex. B, § 12.5.  Because the Options Agreements concern rights and remedies of equity participants

in Caris, there is as a compelling need (consistent with public policy governing investor rights and

responsibilities) for one uniform state law (Delaware law) to govern the rights of the Plan

participants and the internal affairs of shareholders in a uniform and equal manner.

**DEFENDANT BASHER'S EMPLOYMENT WITH CARIS AND NATERA INC**.

38.     As the former Regional Vice President of Oncology Sales for Caris, Defendant Basher was well aware of Caris' reputation and stature as a leader in the molecular profiling industry and particularly its strength in the oncology sector.   Basher was provided with Confidential Information related to this sector of Caris' business.   Among other things this Confidential Information included information about strengths and weaknesses in Caris' product and service offerings, internal competitive analysis and comparisons used by Caris in determining sales strategies, critical customer relationship information such as private contractual terms and conditions with oncology customers and operational information critical to effective sales and servicing of those customers (such as relevant contact persons, decision making personnel and requirements, servicing preferences and requirements, and the like), and detailed information about the technologies used by Caris and matters under research and development (both new technologies and improvements on existing ones).

39.     Defendant Basher was also provided, and paid to develop for Caris' benefit, goodwill with Caris customers and employees, and confidential knowledge about Caris' employees (particularly its oncology focused sales force) and customers (particularly its oncology related customers). Caris' investment in providing Defendant Basher an opportunity to have contact with its customers and its Confidential Information was undertaken in reliance upon, and with the specific understanding that Defendant Basher would not use this customer goodwill and Confidential Information for the benefit of a competitor.

40.     Like the other individual Defendants, Defendant Basher was offered stock options and accepted them and the conditions that came with them.  In each such occurrence, Defendant Basher also agreed to the terms of an Options Agreement.  The Options Agreement includes Confidential Information obligations that are ongoing.

41.     Defendant Basher resigned his employment to join Defendant Natera Inc. ("Defendant Natera") in February 2019.  Defendant Basher indicated no intent to compete or otherwise violate his Options Agreements at the time and Caris was of the understanding that his position would not be competitive at Natera because it was not in the business of providing molecular profiling for oncology purposes.   Accordingly, Caris did not take the position that Basher could not be employed with Natera but it did send Basher a reminder letter regarding his obligations (including his confidentiality, customer nonsolicit and employee nonsolicit obligations) to make it clear he was expected to abide by them.

## THE DELIBERATE RAIDING OF CARIS' ONCOLOGY SALESFORCE

42.     Unbeknownst to Caris at the time, upon information and belief, Natera and Basher did have a plan to go into competition with Caris in the oncology space. By September of 2019 Natera had announced a deal (something it had apparently been working on for some time) to partner with Foundation Medicine to offer oncology-focused genome profiling products and services that directly compete with Caris' business.

43.     Upon information and belief, Basher and Defendant Natera then set into action a plan to target and raid Caris' oncology-focused molecular profiling sales force in and around the United States to get an unfair head start in competition with Caris.  On information and belief, Defendant Basher used Caris' Confidential Information to cherry pick the key salespeople he wanted to poach from Caris. Defendant Basher was in a position to know exactly which Caris employees were most useful to launching a competing oncology line and who he could induce to defect; after all, Defendant Basher directly or indirectly supervised many of the Defendant Defendants when he served as Caris' Regional Vice President and had inside knowledge regarding Caris' employment programs, training, reward and compensation systems and benefits.

44.     Upon information and belief, to conceal their improper recruiting activities, Defendants Basher and Natera retained a familiar third-party recruiter.  While there are certainly hundreds, if not thousands, of recruiting firms that could have been retained by them,  Caris believes they intentionally chose to use a third-party recruiter that Caris had historically retained in order to capitalize on confidential inside knowledge Basher and the recruiter gained from their past association with Caris.

45.     Upon information and belief, through this coordinated effort Defendants Natera and Basher capitalized on and converted to their use Caris Confidential Information and the goodwill with employees and customers that Caris had paid Defendant Basher and other Caris employees to develop (thus avoiding the investment cost and essentially stealing Caris' investment).  Raiding Caris' sales force also had the added benefit of intentionally interfering with Caris' ability to compete with Defendant Natera – creating a void Natera could then capitalize on by targeting Caris' customers – a classic unfair competition scenario.

46.     Upon information and belief, Defendants Natera and Basher carefully masterminded their actions. In what appears to be an effort to shield Defendant Basher from liability, Defendant Basher coordinated his misdeeds so that nothing overt would happen until after the time period for his contractual non-recruitment and no-hire obligations under his Option Agreements expired in March.

47.     A month later, in April of this year, it became obvious that a carefully coordinated raiding plan had been in the works for quite some time because a mass resignation event occurred— all on the same day.  On April 20, 2020, seven key members of Caris' oncology sales force, who lived and worked in six different states, all tendered their resignation on exactly the same day to go to Natera. In fact, Defecting Defendants Cramer and Ledford tendered their resignations within just

two minutes of one another. The fact that all Defecting Defendants resigned in unison on the same day illustrates that their resignations were no coincidence and part of a larger, coordinated conspiracy arranged in advance.

## DEFECTING DEFENDANTS' DUTY OF LOYALTY VIOLATIONS

48.     As employees of Caris (many in leadership roles), the Defecting Defendants owed Caris a duty of loyalty and responsibility which included an obligation to not intentionally engage in conduct harmful to Caris' business.   Both contractually and as individuals with fiduciary responsibilities to Caris if they became aware of a threat to Caris' business, they had a duty to report that threat to Caris' upper management.   This was so that steps could be taken to try and prevent the harm.   By secretly conspiring to pull off a mass resignation on the same day, the Defecting Defendants violated their duties to Caris.   And, by conspiring with one another to help induce and encourage others in the group to resign in unison so Caris would be crippled and less able to respond, the Defecting Defendants violated not only their duties of loyalty but also their contractual obligations to Caris.

## INTENTIONAL INTERFERENCE WITH CONTRACT

49.     Upon information and belief, not only was this mass raiding event by Natera a conspiracy intentionally designed to harm Caris, it was also direct interference with the contractual obligations of the Defecting Defendants by Defendants Natera and Basher.   Basher and Defendant Natera (through Basher's imputed knowledge to the company if not through independent knowledge) were aware of Caris' incentive Plan and the restrictions in its Options Agreements used with the oncology sales force.

50.     Each of the Defecting Defendants were subject to one or more Options Agreements.   See Exh. B – H.   Some of these Option Agreements were accepted by individual Defendants as

recently as February 27, 2020.  All of these Options Agreements contained the four primary obligations described in Paragraphs 34 - 36 above – the Confidential Information Obligation, the Employee Nonsolicit and No-Hire Obligation, and the Customer Nonsolicit and Noncompete Obligation (collectively the "Option Agreement Protective Covenants").

51.     Upon information and belief, the Defecting Defendants were all induced by Defendant Basher and Defendant Natera, either directly or indirectly, to violate their Option Agreement Protective Covenants as described throughout this Complaint.  The Defecting Defendants were induced to leave Caris and go into competition with it.  Upon information and belief, Defecting Defendants were encouraged or instructed to assist each other in conspiring to engage in a coordinated mass resignation all on the same day, to keep this impending mass resignation secret until the day it occurred, and to take active steps to use Confidential Information to solicit and divert the customers and customer prospects of Caris away from Caris (including taking steps to further this action while still employed).

52.     Upon information and belief, the Defendants' conspiratorial plan to unfairly compete with Caris and have the Defecting Defendants solicit the same customers they had been soliciting for Caris is exemplified by Defecting Defendant Shipp's actions. After he resigned, Shipp was asked by one of the remaining members of the Caris sales force to assist in rescheduling and transitioning sales meetings that Shipp placed on his calendar for Caris so Caris could send a replacement to those meetings.  Shipp refused and explained that it was his plan to keep those meetings and make the sales calls but to do it for Natera, not Caris—clearly intending to convert specific sales opportunities and goodwill he was paid to develop for Caris to his and Defendant Natera's benefit. In doing this, Shipp was taking active steps to steal a sales opportunity on behalf of a competitor, even while still an employee of Caris.

53.     Upon information and belief, the raiding conspiracy not only includes plans to target and steal Caris' prospective and current customers as exemplified above, but also involves the unauthorized appropriation of Caris' Confidential Information in violation of common law and contractual duties the Defecting Defendants owe to Caris.  Defendant Ledford's actions are an example. During his employment with Caris, Ledford used his position of trust and confidence to access Caris' Confidential Information and download all of the Caris contacts (including customers and office staff) that he worked with.

54.     Upon information and belief, Ledford was not alone in misappropriating Confidential Information to use at Natera.   On April 2, 2020, just a few weeks before she resigned, Defecting Defendant Cramer sent to her personal email address a collection of confidential Caris materials. This is described in more detail in Paragraphs 73 (a)  - (s) below.  Many of these documents were clearly marked "Confidential Information."  They included proprietary Caris training materials, specific goals for certain Caris sales territories, Caris sales pitch decks, plans for new Caris products launching in 2020, sales tactics to generate new business for Caris and Caris client lists.

55.     Upon information and belief, on April 16, 2020, Defecting Defendant Cramer even went so far as to use the Caris contact information she had with a customer to reach out to that customer, while she was still an employee of Caris, to ask the customer to change on its listserv her email address from that provided by Caris to her personal email address.  That same day, Cramer sent to Sause (a fellow conspirator and member of the Defecting Defendants) an email wherein she remarked "Oh, they added my gmail that I asked to switch to sweet!! Ok so will [sic] still get these updates."  The apparent purpose of these premeditated plans would be to facilitate covert continued correspondence with the customer outside of Caris' view and while working for Natera.

## CAUSES OF ACTION

### COUNT I — CIVIL CONSPIRACY AGAINST ALL DEFENDANTS

56.    All the preceding paragraphs are incorporated herein by reference.

57.    Defendants Natera and Basher, along with the Defecting Defendants, engaged in a combination of efforts to accomplish a number of illegal purposes.  These illegal purposes included the purposes of tortuously interference with contracts Caris has with its oncology sales force, inducing Caris employees to violate their contractual obligations to Caris, misappropriation Confidential Information, converting the goodwill and other proprietary interests of Caris for the benefit of a competitor, and using unlawful means to interfere with the Caris relationships with customers and prospective customers, among other things, as described more fully in this Complaint above.

58.    In the pursuit of these unlawful purposes, the Defendants engaged in one or more unlawful, overt acts taken in the pursuit of the conspiracy's unlawful purpose.

59.    As a result of the conspiracy, Caris has been damaged.  A significant portion of the damages Caris has suffered and continues to suffer from Defendants engaging in a civil conspiracy are incapable of exact proof, but are in excess of $75,000.00, exclusive of interests, costs and attorneys' fees. Caris has no adequate remedy at law as full, complete and efficient to the ends of justice as preliminary and permanent injunctive relief to remedy the injury from Defendants' concerted wrongful acts.

### COUNT II — TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONSHIPS AND PROSPECTIVVE BUSINESS RELATIONSHIPS

60.    All the preceding paragraphs are incorporated herein by reference.

61.    Caris enjoyed longstanding relationships with its customers and employees, and had a reasonable expectation for the continuance of these relationships absent illegal interference. In

addition, Caris had a reasonable expectation that the Option Agreement Protective Covenants would be honored by employees who accept the stock option awards it issued.

62.     The Defecting Defendants entered into the Option Agreements and were bound by them. Accordingly, both during employment and for the applicable restricted periods thereafter, the Defecting Defendants were legally obligated to comply with the Option Agreement Protective Covenants.

63.     Despite knowledge of the Option Agreement Protective Covenants, Defendants Natera and Basher induced and encouraged the Defecting Defendants to violate these covenants and breach their contractual obligations to Caris.

64.     Despite knowledge of the Option Agreement Protective Covenants that they were under, the Defecting Defendants conspired together and encouraged and induced each other to violate their covenants and breach their contractual obligations to Caris.

65.     The Defendants acted intentionally without justification to try to gain a competitive advantage in the molecular profiling business, and to intentionally cause harm to the business of Caris.

66.     Upon information and belief, the Defendants have used unlawful means (such as the use of Caris Confidential Information, computers and other property, and time) to interfere with the relationship between Caris and one or more of its customers, and are threatening to continue to do so.  This activity has damaged the goodwill of Caris' business and threatens to cause the loss of customers and prospective customers if it has not done so already.

67.     A significant portion of the damages Caris has suffered and continues to suffer from the intentional and tortious interference described in this Complaint is incapable of exact proof, but exceeds $75,000.00, exclusive of interest, costs and attorneys' fees. Caris has no adequate remedy

at law as full, complete and efficient as preliminary and permanent injunctive relief to remedy the injury from the Defendants' tortious interference with Caris' employee and customer relationships.

### COUNT III — BREACH OF CONTRACT AGAINST DEFECTING DEFENDANTS

68.     All the preceding paragraphs are incorporated herein by reference.

69.     The Defecting Defendants all entered into Options Agreements with Caris with substantially the same set of Option Agreement Protective Covenants.  Caris acted in reliance upon those contracts in giving the individual Defendants access to Confidential Information and customer development opportunities for its benefit, among other things.  Caris has performed its obligations under those contracts, and the Defecting Defendants have not.

70.     Each of the Defecting Defendants has violated his or her contractual obligations to Caris in an Option Agreement Protective Covenant in some way.  Each Defecting Defendant has violated the Customer Nonsolicit and Noncompete Restriction by, among other things, providing services to and otherwise enabling and aiding a third party (Natera and Basher) in "Restricted Activity" (as it is defined in the Option Agreement).

71.     Each Defecting Defendant has violated the Employee Nonsolicit and No-Hire Restriction by, among other things, participating in a scheme to encourage and induce fellow employees in the oncology sales group to all resign in unison and go to competitor Natera.

72.     Upon information and belief, Defendant Basher has induced the various Options Agreement violations described above, by among other things, using confidential information about Caris' oncology sales force to assist Natera in recruiting and hiring away key employees to compete with Caris as described above.

73.     Upon information and belief, Defecting Defendant Cramer breached the Confidential Information Obligation restrictions in her Options Agreement, by among other things, engaging in the following in an effort to prepare to compete with Caris:

(a)     At 7:45 a.m. on April 2, 2020, while still employed by Caris, Defecting Defendant Cramer sent to her personal email address a confidential business planning document belonging to Caris, in violation of the stock option agreement. The business planning document identified, among other things, Caris clients and opportunities for growth.

(b)     At 7:45 a.m. on April 2, 2020, while still employed by Caris, Defecting Defendant Cramer sent to her personal email address a confidential spreadsheet that belonged to Caris and outlined Caris' regional sales goals for 2019, in violation of the stock option agreement.

(c)     At 7:45 a.m. on April 2, 2020, while still employed by Caris, Defecting Defendant Cramer sent to her personal email address a confidential spreadsheet that belonged to Caris and outlined Caris' regional sales goals for 2020, in violation of the stock option agreement.

(d)     At 7:46 a.m. on April 2, 2020, while still employed by Caris, Defecting Defendant Cramer sent to her personal email address a confidential sales presentation that belonged to Caris, in violation of the stock option agreement. The sales presentation outlined some of Caris' goals for a given timeframe and the incentives it offered sales personnel who met those goals.

(e)     At 7:47 a.m. on April 2, 2020, while still employed by Caris, Defecting Defendant Cramer sent to her personal email address a confidential company records that identified certain Caris customers and specific plans for assisting those customers in a given quarter.

(f)      At 7:49 a.m. on April 2, 2020, while still employed by Caris, Defecting Defendant Cramer sent to her personal email address a confidential business planning presentation belonging to Caris, in violation of the stock option agreement.

(g)      At 7:48 a.m. on April 2, 2020, while still employed by Caris, Defecting Defendant Cramer sent to her personal email address a confidential company record, belonging to Caris, concerning a performance improvement plan for a Caris employee. Defecting Defendant Cramer sent this email in violation of the stock option agreement.

(h)      At 7:49 a.m. on April 2, 2020, while still employed by Caris, Defecting Defendant Cramer sent to her personal email address a confidential company records concerning expectations of oncology sales personnel belonging to Caris, in violation of the stock option agreement.

(i)      At 7:50 a.m. on April 2, 2020, while still employed by Caris, Defecting Defendant Cramer sent to her personal email address a confidential "pitch deck" presentation belonging to Caris, in violation of the stock option agreement. The presentation identified certain Caris customers.

(j)      At 7:51 a.m. on April 2, 2020, while still employed by Caris, Defecting Defendant Cramer sent to her personal email address a confidential "pitch deck" presentation belonging to Caris, in violation of the stock option agreement.   The presentation identified certain Caris customers, sales achievements and goals, and initiatives to develop and retain Caris talent.

(k)      At 7:52 a.m. on April 2, 2020, while still employed by Caris, Defecting Defendant Cramer sent to her personal email address confidential company records belonging to Caris, in violation of the stock option agreement. These records identified specific sales territory goals and baseline requirements.

(l)      At 7:53 a.m. on April 2, 2020, while still employed by Caris, Defecting Defendant Cramer sent to her personal email address a confidential job performance review that belonged to Caris, in violation of the stock option agreement. The

job performance review identified several of Caris' customers and discussed plans to meet with those customers.

(m)     At 7:54 a.m. on April 2, 2020, while still employed by Caris, Defecting Defendant Cramer sent to her personal email address a confidential new hire training presentation belonging to Caris, in violation of the stock option agreement.

(n)     At 7:55 a.m. on April 2, 2020, while still employed by Caris, Defecting Defendant Cramer sent to her personal email address a confidential workshop presentation belonging to Caris, in violation of the stock option agreement. The workshop presentation discussed techniques for building relationships with existing and prospective Caris customers.

(o)     At 7:59 a.m. on April 2, 2020, while still employed by Caris, Defecting Defendant Cramer sent to her personal email address several compensation documents belonging to Caris, in violation of the stock agreement.

(p)     At 8:22 a.m. on April 2, 2020, while still employed by Caris, Defecting Defendant Cramer sent to her personal email address a confidential company records, belonging to Caris, that outlined the process specimen follow when being evaluated by Caris' laboratory in violation of the stock agreement.

(q)     At 8:25 a.m. on April 2, 2020, while still employed by Caris, Defecting Defendant Cramer sent to her personal email address a confidential conference presentation belonging to Caris, in violation of the stock option agreement. The presentation identifies certain Caris customers and employees, growth opportunities, tools and strategies for maximizing business opportunities and new sales techniques and tactics.

(r)     At 8:27 a.m. on April 2, 2020, while still employed by Caris, Defecting Defendant Cramer sent to her personal email address a confidential presentation concerning non-single cell lung cancers belonging to Caris, in violation of the stock option agreement.

(s)      At 8:37 a.m. on April 2, 2020, while still employed by Caris, Defecting Defendant Cramer sent to her personal email address a confidential presentation concerning certain gastrointestinal cancers belonging to Caris, in violation of the stock option agreement.

To the extent the foregoing actions are part of preparations to compete with Caris, they also constitute a threatened breach of the Customer Nonsolicit and Noncompete Restrictions.

74.     Upon information and belief, Defecting Defendant Ledford breached the Confidential Information Obligation in his Option Agreement by downloading a list of contacts confidentially maintained on Caris' computer system for Caris business purposes (including contacts for its Caris customers and their office staff), in order to use these contacts for Natera's benefit and to compete with Caris.  This also constitutes a threatened breach of the Customer Nonsolicit and Noncompete Restrictions.

75.     Upon information and belief, Defecting Defendant Shipp breached the Confidential Information Obligation and Customer Nonsolicitation and Noncompete Obligations of his Options Agreement by taking information about customer appointments and converting them to his own competitive use for Natera, as described above.  This also constitutes a threatened breach of the Customer Nonsolicit and Noncompete Restrictions.

76.     The Option Agreement Protective Covenants are contained in Schedule A to the Options Agreement.  With respect to special remedies under the Options Agreement, each of the Defecting Defendants has agreed as follows:

> You acknowledge and agree that the Company's damages in event of any breach or threatened breach of your covenants set forth in this Schedule A will be difficult to determine and that without limiting any other right or remedy of the Company, the Company shall be entitled to appropriate injunctive or equitable relief from a court of competent jurisdiction to prevent any breach or threatened breach without the posting of any bond or other security, which rights shall be cumulative

and in addition to any other rights or remedies, in law or equity, to
which the Company may be entitled.

The foregoing is an accurate description of and applicable remedy for the contract violations by
the individual Defendants. Accordingly, Caris seeks injunctive relief to enforce the Option
Agreements and compel the individual Defendants to comply with their obligations under the
Option Agreements.

77.     Caris would also show that the individual Defendants' conduct in breach of their Options
Agreements has caused actual damage to Caris and continues to threaten additional actual damage
to Caris. A significant portion of the damages Caris has suffered and continues to suffer from the
intentional and tortious interference described in this Complaint is incapable of exact proof, but
exceeds $75,000.00, exclusive of interest, costs and attorneys' fees. Caris has no adequate remedy
at law as full, complete and efficient as preliminary and permanent injunctive relief to remedy the
injury from the Defendants wrongful conduct.

### COUNT IV — BREACHES OF FIDUCIARY DUTY AND DUTY OF LOYALTY AGAINST ALL DEFECTING DEFENDANTS

78.     All the preceding paragraphs are incorporated herein by reference.

79.     As Regional Business Directors, Defecting Defendants Alter, Cramer and Ledford were
key and highly-compensated employees (earning well over $100,000 each), occupied positions of
trust and confidence and owed Caris, as their employer, a fiduciary duty, a duty of undivided
loyalty in all matters within the course and scope of their employment, and a duty to not misuse or
misappropriate confidential business information obtained from their employer during their
employment.

80.     As Molecular Oncology Specialists, Defecting Defendants Derr, Hasher, Sause and Shipp
were key and highly-compensated employees (earning well over $100,000 each), occupied

positions of trust and confidence and owed Caris, as their employer, fiduciary duties, duties of undivided loyalty in all matters within the course and scope of their employment and a duty to not misuse or misappropriate confidential business information obtained from their employer during their employment.

81.     Pursuant to these duties, Defecting Defendants were obligated to use their best efforts on behalf of the employer, Caris, and to refrain from acting in a manner inconsistent with or contrary to the best interests of their employer.

82.     On information and belief, Defecting Defendants breached these duties by, among other things, soliciting, recruiting and inducing employees to leave Caris and join its competitor, Defendant Natera, and participating in a conspiracy to hide the pending resignations so that they could all occur at one time and cause the most potential damage and disruption to Caris' business.

83.     On information and belief, Defecting Defendants Cramer and Ledford breached their duties by, among other things, accessing, downloading, copying, transmitting, using and/or sharing confidential business information from Caris computers and/or computer systems to benefit themselves and Defendant Natera while simultaneously harming Caris.

84.     Caris has sustained damages in excess of $75,000.00, exclusive of interest, costs and attorneys' fees, as a result of Defecting Defendants' breaches of their fiduciary duties and duties of loyalty. Caris has no remedy at law that is as full, complete and efficient as preliminary and permanent injunctive relief to prevent further injury resulting from Defecting Defendants' breaches of fiduciary duties and duties of loyalty.

### COUNT V —UNFAIR COMPETITION AGAINST DEFENDANT NATERA

85.     All the preceding paragraphs are incorporated herein by reference.

86.     Defendant Natera unfairly competed with Caris by targeting, soliciting, hiring and/or offering to hire key employees in Caris' molecular profiling business. Defendant Natera's targeted solicitation, offers and hiring, was intended to and did create a void in and decimate Caris' sales force in the United States and thereby diverts the molecular profiling business, its customers and workforce to Natera at Caris' expense.

87.     Defendant Natera also unfairly competed with Caris by targeting, soliciting, hiring and/or offering to hire certain key employees in Caris' molecular profiling business who have knowledge of Caris' confidential information, work product, trade secrets and company records and inducing those employees to use or disclose such information against Caris and for their own personal benefit, for the benefit of Defendant Natera and to the detriment of Caris.

88.     The improper actions of Defendant Natera, independently and in the aggregate, constitute unfair competition and were designed to and have resulted in the purposeful interference with and diminution in value of Caris' molecular profiling business.

89.     Through the targeted solicitation and hiring of Caris' employees, Defendant Natera has gained an unfair and unlawful competitive advantage where they are saved the time, effort and expense of developing their own molecular profiling business in the United States market and recruiting, training and developing their own sales for to service such business.

90.     Upon information and belief, Defendant Natera's actions were undertaken with malice and forethought, and with the express intent to disrupt and damage Caris ability to compete, not through fair and open competition but instead through the use of subterfuge, misappropriation of Caris' Confidential Information, deceptive trade practices and conduct that falls far outside the bounds of ordinary ethical business conduct.

91.     As a result of Defendant Natera's wrongful conduct, Caris has sustained damages in excess of $75,000, exclusive of interest, costs and attorneys' fees.  A significant portion of the damages caused by Defendant Natera's conduct are irreparable in nature and cannot readily quantified. Caris has no remedy at law that is as full, complete and efficient as preliminary and permanent injunctive relief to prevent further injury resulting from Defendant Natera's wrongful acts as set forth herein.

### COUNT VI — AIDING AND ABETTING AGAINST DEFENDANT NATERA

92.     All the preceding paragraphs are incorporated herein by reference.

93.     Defendant Natera aided and abetted Defendant Basher and the Defecting Defendants to harm Caris and to diminish the value of its molecular profiling business through the targeted mass raiding of Caris' employees.

94.     Defendant Natera knew of the plan to poach Defecting Defendants away from Caris' molecular profiling business. Defendant Natera further knew that the mass raiding efforts would cause diminish the value of Caris' molecular profiling business, and that Natera would benefit from this.

95.     On information and belief, Defendant Natera provided Defendant Basher and the Defecting Defendants substantial assistance in soliciting the Defecting Defendants away from Caris. That substantial assistance included, but was not limited to, the sham use of a professional recruiter to conceal the truly tortious and unlawful nature of their solicitation and raiding efforts.

96.     As a proximate result of Defendant Natera's aiding and abetting, Caris has sustained damages in excess of $75,000.00, exclusive of interests, costs and attorneys' fees. A significant portion of the damages caused by Defendant Natera's conduct are irreparable in nature and cannot readily quantified.  Caris has no remedy at law that is as full, complete and efficient as preliminary

and permanent injunctive relief to prevent further injury resulting from Defendant Natera's wrongful acts as set forth herein.

## ALTERNATIVE REFORMATION

97.     In the alternative, should the Court determine any part of the Option Agreement Protective Covenants, or any other operative part of the Option Agreements, to be too broad to be enforced as written, Caris requests that those broad or unenforceable restrictions be enforced in such lesser part as would be deemed reasonable and enforceable under applicable law, and/or that the overbroad restriction be reformed by the Court to make the restriction enforceable to the fullest extent possible for the protection of Caris' legitimate business interests.

98.     Partial enforcement or reformation consistent with the relief described above has been expressly agreed to and authorized by each of the individual Defendants in their Options Agreements (Shedule A, Section IV).  Caris relied upon these contractual representations by the individual Defendants in entering into the Options Agreement. Accordingly, the individual Defendants are barred from taking the position that the Court cannot engage in partial enforcement or reformation under the doctrines of promissory estoppel and contractual estoppel.

## PRAYER FOR RELIEF

For the foregoing reasons, Caris Life Sciences, Ltd. respectfully requests that this Court award it the following relief:

(a) Preliminary and permanent injunctions to restrain and enjoin Defendants from using or disclosing any of Caris' Confidential Information;

(b) A court order directing Defendants to avoid any further solicitation of Caris' current, remaining employees and its former employees who previously (within the preceding 18

months) worked in Caris' molecular profiling business or oncology sales areas to avoid any further interference with Caris' relationships with the aforementioned employees;

(c) A court order prohibiting the Defecting Defendants from engaging in any of the Restricted Activities (as defined in Schedule A to the Options Agreement) until further order of the Court or the expiration of one (1) year from the date the Defecting Defendants come into compliance with the restrictions in Schedule A;

(d) A court order directing Defendants to immediately delete and removal all electronic documents and files containing any of Caris' confidential and proprietary business information from any and all computers, electronic storage media, clouds, servers, or other such media in their possession, custody or control and to return to Defendants all documents, items and copies, both electronic and hard copy;

(e) Compensatory damages for the misappropriation of Caris' confidential business information during the time period before the Court imposed an injunction;

(f) Compensatory damages, to the extent damages are calculable, for the costs associated with replacing improperly solicited employees, lost sales due to the disruptions caused by Defendants' intentional and malicious misconduct;

(g) Compensatory damages for the interference with customer and employee relationships and the diminution in value of Caris' molecular profiling business;

(h) Caris' reasonable attorneys' fees and expenses;

(i) Costs of suit, pre-judgment and post-judgment interest in the maximum amounts allowed by law;

(j)  Exemplary damages in a sum to be determined by the Court and finders of fact in an amount

reasonable and necessary to punish the Defendants for their willful, malicious and wrongful

conduct and to deter future misconduct; and

(k)  Any further relief, whether at law or in equity, that this Court deems just and appropriate.

Dated April 27, 2020                                    Respectfully submitted,

                                                        */s/ M. Scott McDonald*
                                                        _____
                                                        M. Scott McDonald
                                                        Texas State Bar No. 13555505
                                                        John F. McCarthy, Jr.
                                                        Texas State Bar No. 13374500
                                                        Brittaney N. Davis
                                                        Texas State Bar No. 24093760
                                                        Ross G. Reyes
                                                        Texas State Bar No. 24105707

                                                        LITTLER MENDELSON, P.C.
                                                        A Professional Corporation
                                                        2001 Ross Avenue
                                                        Suite 1500, Lock Box 116
                                                        Dallas, TX  75201.2931
                                                        214.880.8100
                                                        214.880.0181 (Fax)
                                                        smcdonald@littler.com

                                                        **ATTORNEYS FOR PLAINTIFF**
                                                        **Caris Life Sciences, Ltd.**

---

ORIGINAL COMPLAINT                                                          PAGE 34

## VERIFICATION

Michael Sullivan, who, after being duly sworn, stated under oath that: he is the Chief Commercial Officer for Caris MPI, Inc. which is a wholly owned subsidiary of Caris Life Sciences Ltd ("Caris"); he/she has read the attached Original Verified Complaint ("Complaint"); he/she is authorized to verity facts in the Complaint on behalf of Caris; and, based upon personal knowledge, Caris has verified that according to the company's records and the best information currently available to the company's employees, the factual statements made in numbered paragraphs 26 – 55, 73 - 76 of the Complaint are true and correct.

Michael Sullivan

Subscribed and sworn to before me on this the 27th day of April, 2020.

Notary Certification:

*Sherri Jones*

SHERRI JONES
Notary Public, State of Texas
Comm. Expires 06-08-2023
Notary ID 128839357

4820-7194-5403.5
4/27/20

ORIGINAL COMPLAINT                                                                PAGE 35